No. 809          November 14, 2024          139

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

JACK SCOTT FARMS, INC.,
*Petitioner,*

*v.*

DEPARTMENT OF STATE LANDS,
*Respondent.*

Department of State Lands
WD20190640;
A178900

Argued November 7, 2023.

Matthew A. Martin argued the cause for petitioner. Also on the briefs were T. Beau Ellis and Vial Fotheringham LLP.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, Pagán, Judge, and Mooney, Senior Judge.

SHORR, P. J.

Affirmed.

**SHORR, P. J.**

Petitioner Jack Scott Farms, Inc. petitions for judicial review of a final order of the Oregon Department of State Lands (DSL), in which DSL asserts regulatory jurisdiction over wetland on petitioner's property under Oregon's Removal-Fill Law, ORS 196.800 to 196.990. Petitioner contends that the order lacks substantial evidence and substantial reason and seeks reversal of the order. Its three assignments of error pertain to what it describes as "three distinct features" on petitioner's property: a historic pond, an irrigation ditch, and a connecting ditch between the two. We conclude that the order is supported by substantial evidence and substantial reason and, therefore, affirm.

We review an agency's final order for substantial evidence and errors of law. ORS 183.482(8)(a), (c). "Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8)(c). "Implicit in the requirement that orders be supported by substantial evidence is an additional requirement that they be supported by substantial reason. An order is supported by substantial reason when it articulates a rational connection between the facts and the legal conclusions it draws from them." *SAIF v. Coria*, 371 Or 1, 12, 528 P3d 785 (2023) (citation, internal quotation marks, and brackets omitted). We are bound by DSL's findings of historical fact if they are supported by substantial evidence in the record. *Id.* at 4.

We begin with the regulatory framework. As relevant here, under ORS 196.810(1)(a) (2015), *amended by* Or Laws 2023, ch 403, §§6, 7, "a person may not remove any material from the beds or banks of any waters of this state or fill any waters of this state without a permit issued under the authority of the Director of the Department of State Lands." DSL has the authority to take action to enforce the rules on unpermitted removal and fill occurring in any of the waters of this state. ORS 196.860(1), (3). The definition of "waters of this state" is

"all natural waterways, tidal and nontidal bays, intermittent streams, constantly flowing streams, lakes, wetlands, that portion of the Pacific Ocean that is in the boundaries of this state, all other navigable and nonnavigable bodies of water in this state and those portions of the ocean shore, as defined in ORS 390.605, where removal or fill activities are regulated under a state-assumed permit program as provided in 33 U.S.C. 1344(g) of the Federal Water Pollution Control Act, as amended."

ORS 196.800(15) (2013), *amended by* Or Laws 2023, ch 403, §§13, 14; OAR 141-085-0510(107). "'Wetlands' means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." ORS 196.800(17) (2013). "Any person who violates any provision of ORS 196.600 to 196.921 or any rule, order or permit adopted or issued under ORS 196.600 to 196.921 shall be subject to a civil penalty in an amount to be determined by the Director of the Department of State Lands of not more than $10,000 per day of violation." ORS 196.890.

OAR chapter 141, division 90, contains the rules for wetland delineation report requirements and for jurisdictional determinations for the purpose of regulating fill and removal within waters of this state. A "jurisdictional determination" (JD) is defined as:

"a written decision by the Department that waters of this state subject to regulation and authorization requirements [of certain OARs] are present or not present within a study area. The JD may include a delineation of the geographic boundaries of the area subject to state jurisdiction. For example, a JD may include the location of a wetland boundary or the location of the ordinary high water line (ordinary high water mark) of a waterway. A JD may, but does not necessarily, include a determination that a particular activity in a water of this state is subject to authorization requirements. The decision record includes the basis of the jurisdictional determination and is a final order subject to reconsideration according to the provisions in [OAR] 141-090-0050."

OAR 141-090-0020(20). A landowner may seek reconsideration of a JD and then request review through a contested case hearing. OAR 141-090-0050(1), (4).

We turn to the facts of this case.[1] Petitioner purchased the subject property in 2013 to expand its hazelnut farming operations. As part of preparing the land for farming, petitioner excavated and graded the land. Subsequently, DSL received a report of excavation work at the subject property possibly in violation of Oregon's Removal-Fill Law. DSL employees inspected the property and determined that approximately four and one-half acres of wetland existed on the subject property prior to grading. In August 2019, DSL issued a Proposed Order for Corrective Action and Civil Penalty, finding that petitioner had violated Oregon's Removal-Fill Law. The proposed order required petitioner to, among other things, engage a wetland consultant to prepare a wetland delineation report and submit it to DSL.[2] Petitioner did not appeal that proposed order and it became final as a matter of law.

Petitioner hired Terra Science, Inc. (TSI) to perform the wetland delineation and prepare the report. TSI provided a report dated December 9, 2019, to DSL. TSI confirmed the existence of wetlands and concluded that 2.33 acres of "pre-disturbance aquatic features" existed on the property. The report summary included two features: "excavated drainage" in the amount of 0.36 acres and "historically excavated pond" in the amount of 2.3 acres. A map of the subject area is below; within the study area boundary, the solid line that crosses diagonally near the bottom of map represents the excavated drainage and the dotted area represents the pond.

---

[1] We provide additional facts, as necessary, in our discussion of each of petitioner's assignments of error.

[2] A wetland delineation report is:

"a written document that contains the methods, data, conclusions, and maps used to determine if wetlands and other waters of this state are present within a study area and, if so, describes and maps their locations and geographic extent. A wetland determination report documenting the presence or absence of waters of this state is included within this definition."

OAR 141-090-0020(45).



DSL reviewed the report to determine, in part, whether the wetland features identified fell within the jurisdiction of DSL. DSL ultimately accepted TSI's wetland delineation with certain alterations and, in April 2020, issued a jurisdictional determination concurring with TSI's wetland identification and finding that the wetlands on petitioner's property fell within DSL jurisdiction and were subject to the Removal-Fill Law.

Petitioner sought reconsideration of the April 2020 jurisdictional wetland determination, and, in December 2020, DSL issued its reconsideration decision. DSL found that the on-site drainage and the historically excavated pond were still determined to be jurisdictional. Petitioner then requested a contested case hearing, which was held before an administrative law judge (ALJ) on August 17, 2021. The ALJ issued a proposed order in December 2021.

The Director of DSL adopted that proposed order, with one change for clarity, and issued a final order on May 2, 2022, "affirming [DSL's] jurisdictional determination delineating a total of 2.33 acres of jurisdictional wetland on the subject property." Petitioner seeks judicial review of that final order.

Before we address the specific assignments of error, we note that both parties agree that the final order accurately states the burden of proof for the parties below:

"As the proponent of the jurisdictional determination, DSL bears the burden of proving, by a preponderance of the evidence, that it correctly determined the subject area was jurisdictional wetlands. Similarly, to the extent [petitioner] asserts exemptions from or affirmative defenses to DSL's jurisdictional determination, [petitioner] bears the burden to establish any such exemptions or defenses by the same standard of proof. *** Proof by a preponderance of the evidence means that the fact finder is convinced that the facts asserted are more likely true than false."

We begin with petitioner's third assignment of error. Petitioner contends that DSL erred in concluding that the historic pond is a jurisdictional water feature. There is no dispute that there was a pond on the property and that the pond was likely used for the storage of logs at one point in time. Petitioner's theory below was that the pond was exempt from DSL's jurisdiction based on OAR 141-085-0515(7)(h). OAR 141-085-0515 "describes the types and jurisdictional limits of the waters of this state that are regulated by the Department of State Lands." Paragraph (7)(h) of that section provides an exemption relied on by petitioner here:

"Exempt Artificially Created Wetlands and Ponds. Artificially created wetlands and ponds *created entirely from upland*, regardless of size, are not waters of this state if they are constructed for the purpose of:

"*****

"(h)   Log storage[.]"

OAR 141-085-0515(7)(h) (emphasis added). The parties disagreed that the pond was "created entirely from upland." "Upland" is defined as, "any land that is not a wetland or

other water." OAR 141-090-0020(41). The final order concluded that

> "DSL established, by a preponderance of the evidence, that the excavated pond feature, identified in the wetland delineation report was created from a pre-existing, naturally occurring wetland feature (*i.e.*, a water-retaining meander scar). As such, the pond was not excavated entirely from uplands. As an artificially created pond greater than one acre in size the feature qualifies as waters of the state and falls within the jurisdiction of DSL unless shown to be exempt. OAR 141-085-510(107) and OAR 141-085-515(6). \* \* \* [Petitioner] failed to demonstrate the former pond was exempt as a log storage pond because it was not created entirely from uplands."

On review, petitioner contends that DSL erred in its reliance on the testimony of the two DSL employees who testified as experts at the hearing, Matthew Unitis and Peter Ryan, without explanation or reasoning, over the testimony of two of the witnesses called by petitioner, Walter "Jack" Scott and Nathan Birky. Petitioner asserts that the testimony of Unitis and Ryan was given dispositive weight by the ALJ, who accepted their testimony to the exclusion of contrary testimony. In petitioner's view, when the ALJ appeared to treat the expert testimony from Unitis and Ryan as conclusive on the issues raised, without making an attempt to justify its decisions to do so, that left its final order bereft of substantial evidence and substantial reason. In response, DSL argues that its witnesses were qualified to testify as they did, and that the testimony offered by Scott and Birky did not counter the evidence presented by DSL. We disagree with petitioner's characterization of the final order and agree with DSL.

Unitis is a jurisdictional coordinator for DSL. He testified about his education and experience and the ALJ accepted him as an expert in wetland delineations and jurisdictional wetlands over the objection of petitioner.[3] The final order contains the following findings of fact: "Unitis

___

[3] We do not understand petitioner to challenge the expert designation on review. Rather, petitioner contends that DSL was required to, and did not, provide an explanation for why it was relying on the testimony of the DSL employees over two of petitioner's witnesses.

reviewed historic information and his own data collected during the August 2019 inspection"; he consulted a DSL-created hydric soil map and learned that the subject property consisted of a type of hydric soil, which was consistent with soil samples;[4] and he consulted maps for the National Wetland Inventory. "From the historic information, including evidence of low-land meander scars and natural drainage features, soil samples, and information provided in the wetland delineation report, Mr. Unitis concluded the former pond was likely created from a pre-existing wetland feature." Those findings are supported by the record.

The findings also include the fact that Unitis accepted the total acreage of wetlands identified in TSI's report, but he had questions about the report's conclusions regarding the historic existence and use of the wetland features.[5] Unitis exchanged emails and information with the author of the TSI report, Monnin, and ultimately Monnin "agreed that the historic information did not support the determination that the pond was created entirely from uplands or was used primarily for log storage."

Peter Ryan, an aquatic resources specialist for DSL, testified at the hearing as an expert in the review of wetland delineation reports, and testified to his familiarity with DSL rules and jurisdiction standards. He was assigned petitioner's request for reconsideration of the April 2020 jurisdictional determination. As part of his review, he gathered additional information from the US Army Corps of Engineers: historical aerials of the subject property, the earliest of which was from 1936. He reviewed aerial images, topographic maps, and the National Hydrography Dataset and determined that the subject property sits in the natural floodplain of Crabtree Creek. He focused on the earliest photos because the primary question was the origin of the feature, *i.e.*, the pond. He testified that based on his review of the information about the pond, "it appeared to have been a natural feature [that] may have been modified."

The final order summarizes the DSL evidence:

---

[4] Unitis testified that "hydric" means "typically wet."

[5] The TSI report included a determination that the former pond was initially created from uplands around 1940 as part of a logging operation.

"At hearing, DSL presented significant documentary evidence and expert testimony supporting its finding that the feature in question was more likely than not excavated from an existing wetland feature created by the overflow of Crabtree Creek. That evidence included DSL created soil maps, FEMA floodplain data, the National Wetland Inventory maps for the area surrounding the subject property, and hydrographic data related to the floodplain of Crabtree Creek."

The order goes on to explain why DSL was not persuaded by petitioner's witnesses. To rebut the information from DSL, petitioner "relied on testimony from Mr. Scott and from Nathan Birky, a neighbor located across the road from Mr. Scott who resided, for a period prior to 1965, on the subject property." The final order describes Birky's testimony as "anecdotal at best." Birky lived on the property beginning in 1948 from approximately the ages of 2 to 19; he testified that there had been logging on the property prior to his family moving there, but he did not know when, and his father did some additional logging of Douglas Fir trees. According to Birky, there was a sawmill, a log pond, and a sawdust pile; Birky described various other physical features of the property.

Scott provided testimony about the condition of the subject property when it was purchased by petitioner—including the kinds of vegetation present—and about the process of clearing the land so that it could be used for hazelnut farming. Regarding the acreage near the historical pond, he explained, "We didn't think clearing brush was any problem. There was absolutely no water. All it was, it was hawthorn trees, one big cottonwood tree, a couple oak trees and berry briars." The final order summarizes the ALJ's view about Scott's testimony:

"To the extent that Mr. Scott testified to the existence of upland trees present on the study area prior to grading, Mr. Scott's qualifications to identify and distinguish tree species and their viability in wetland environments was not established at hearing and is therefore insufficient to overcome the expert testimony provided by DSL witnesses."

The final order also recognizes that petitioner's "consultant agreed with DSL that the artificially created

pond was jurisdictional because it was larger than one acre and did not qualify for exemption as a log storage pond."

The facts articulated in the final order are supported by the record. Further, we conclude that the final order "articulates a rational connection between the facts and the legal conclusions it draws from them." *Coria*, 317 Or at 12. The order concludes that DSL's evidence established that the pond feature "was created from a pre-existing, naturally occurring wetland feature" and therefore "not excavated entirely from uplands." Petitioner had the burden to establish by a preponderance of the evidence that the pond qualified for the log storage exemption from DSL jurisdiction, but it did not meet that burden. For the foregoing reasons, we reject the arguments raised in petitioner's third assignment of error.

Petitioner's first assignment of error is related to its third. Petitioner notes that there are two primary water features in the delineation area: the historic pond and the irrigation ditch. Petitioner then asserts that those two features are connected by a third water feature, which it refers to as the "connecting ditch."[6] Petitioner contends that DSL erred in concluding, by implication and without discussion, that the connecting ditch is a jurisdictional water feature. It asserts that DSL's tacit assumption of jurisdiction over the connecting ditch is not supported by any evidence, nor any reasoning, and it is contrary to the Removal-Fill Law and DSL's administrative rules. In response, DSL argues that the documentary evidence and expert testimony in the record treats the entire 2.3-acre wetland as a single unit, that the area that petitioner identified is within the area that TSI designated as wetland, and that the area is also within the area that DSL's experts described as the site of the historic, natural wetland. We agree with DSL's assessment of the final order and the record that supports it.

Although petitioner contends in its reply brief that "[b]efore DSL, Petitioner repeatedly raised the Connecting

---

[6] We use the terms "irrigation ditch" and "connecting ditch" because those are the terms used by petitioner and not because we agree that petitioner's usage meets the definitions of certain terminology contained in the Oregon Administrative Rules.

Ditch as a jurisdictionally distinct body of water," we note that petitioner first asserted that the connecting ditch should be assessed as its own distinct feature in its post-hearing memorandum dated September 20, 2021. Even in its pre-hearing memorandum, petitioner addressed the pond and connecting ditch as one unit that was all part of a 2.3-acre feature.[7] On review, petitioner does not dispute the fact that the connecting ditch is within the 2.3 acre wetland as designated by TSI, the consultant it hired. It also does not explain why, in its view, the connecting ditch had to be considered *separately* when the area it refers to as a distinct body of water was included as part of the 2.3 acre wetland that was determined to be jurisdictional.

Petitioner argues that the "undisputed evidence in the record demonstrates that this ditch was artificially constructed out of upland," and that under OAR 141-085-0515(8)(b), the ditch would not be jurisdictional. OAR 141-085-0515(8) addresses jurisdiction both over ditches created from wetland and ditches created from upland. It provides, in part:

"Jurisdictional Ditches. Except as provided under [sections regarding non-jurisdictional irrigation ditches and non-jurisdictional roadside and railroad ditches], ditches are jurisdictional if they are:

"(a)  Created in wetlands, estuaries, tidal rivers or other waters of this state; or

"(b)  Created from upland and meet the following conditions:

"(A)  Contain food and game fish; and

"(B)  Have a free and open connection to waters of this state. ***."

Because, as explained above, the connecting ditch was created in wetlands, it qualifies as jurisdictional under OAR 141-085-0515(8)(a). As we explained above, the conclusion in the final order that the 2.3 acre area is jurisdictional is

---

[7]  In that document, in its discussion of the 2.3-acre feature, petitioner stated that "the excavated pond was originally fed by a north-draining ditch, which was improved following the conversion of the property to agricultural purposes in the 1950s. *** Eventually, this northern ditch was abandoned and plowed over in favor of a connection to the southern excavated drainage."

supported by substantial evidence and reason. We therefore reject petitioner's first assignment of error.

We turn to petitioner's second assignment of error, in which petitioner asserts that DSL erred in concluding that the irrigation ditch is a jurisdictional water feature. Petitioner makes two arguments in support of that assignment: (1) the irrigation ditch is not a "water of this state" as defined by the Removal-Fill Law and (2) even if the irrigation ditch is a water of this state, it is exempt from the Removal-Fill Law as a non-jurisdictional irrigation ditch. In response, DSL argues that the channel had been created from a pre-existing perennial stream and that the final order determined that the irrigation channel was a water of the state. DSL also argues that petitioner did not prove that the channel fit within the exception for irrigation ditches in OAR 141-085-0515(9), and therefore, the order correctly determined that the exception does not apply.

The final order contains the legal conclusion that "DSL correctly determined that wetlands on [petitioner's] property were jurisdictional wetlands subject to Oregon's Removal-Fill Law." In its discussion of the drainage channel—the feature that petitioner refers to as the irrigation ditch—the final order states:

"* * * [Petitioner] argues that the channel feature is not within the jurisdiction of DSL because it was a wholly manmade irrigation ditch and therefore exempt from regulation under OAR 141-085-0515(9).

"OAR 141-085-0010(30) defines a ditch, for the purposes of DSL's enforcement of the Removal-Fill Law, as 'a manmade water conveyance channel.' The evidence at hearing establishes that the irrigation/drainage channel in issue was a pre-existing drainage feature of the floodplain that was channelized to improve water conveyance. The preponderance of the evidence indicates the feature in issue existed in some form as far back as 1936, prior to any logging operations on the subject property. OAR 141-085-0010(30) also provides, '[c]hannels that are manipulated streams are not considered ditches.' [Petitioner] offered no persuasive evidence to rebut the interpretations of historical data presented by DSL expert witnesses. More likely than not, the irrigation/drainage channel was created by

widening, deepening, and/or reinforcing the banks of a pre-existing naturally occurring drainage channel. As such, it does not qualify as a ditch under OAR 141-085-0010(30) and is not exempt from DSL jurisdiction. OAR 141-085-0515(8)(a). Moreover, DSL established that the drainage channel cannot be dewatered due to multiple sources contributing water to the connected system. As such, even if [petitioner] were able to establish the channel is a 'ditch' under OAR 141-085-0010(30), it failed to show that conveyance qualifies as a non-jurisdictional ditch pursuant to OAR 141-085-0515(9).

"DSL established that * * * the irrigation/drainage ditch [was] created from pre-existing naturally occurring wetlands. [Petitioner] failed to demonstrate that any of the features within the study area of the subject property were exempt from DSL jurisdiction for purposes of this state's Removal-Fill Law."

Petitioner asserts that DSL assumed that the irrigation ditch was jurisdictional before making findings regarding the applicability of a jurisdictional exception and concluding that the irrigation ditch was not a non-jurisdictional irrigation ditch. For that reason, petitioner argues, DSL's conclusion that the irrigation ditch is jurisdictional is neither supported by substantial reason nor by substantial evidence. Further, according to petitioner, even accepting DSL's findings, the irrigation ditch is not a "water of the state." We disagree with petitioner's assertions that the final order is deficient; it is supported by substantial evidence and substantial reason.

We first note that the final order includes a list of definitions from OAR 141-085-0510 that were relevant for the analysis contained therein. It states that a "channel" is defined as "a natural (perennial or intermittent stream) or human made (e.g. drainage ditch) waterway that periodically or continuously contains moving water and has a defined bed and bank that serve to confine the water." OAR 141-085-0510(12). The definition for "ditch" is also included: "a manmade water conveyance channel. *Channels that are manipulated streams are not considered ditches.*" OAR 141-085-0510(30) (emphasis in final order). The final order also includes the definition for "perennial stream," which is "a

stream that has continuous flow in parts of its bed all year long during years of normal precipitation." OAR 141-085-0510(74). Because the order specifically refers to this water feature as a "channel," emphasizes the portion of the definition for "ditch" that it does, and specifically states that "it does not qualify as a ditch," we understand the order to conclude that the subject feature was a channel that was a manipulated stream, and not a ditch.[8] The final order also states that

"OAR 141-085-0515 identifies DSL's removal-fill jurisdiction by waterbody type and provides, in pertinent part:

"This section describes the types and jurisdictional limits of the waters of this state that are regulated by the Department of State Lands.

"\* \* \* \* \*

"(3) Waters, Including Rivers, Intermittent and Perennial Streams, Lakes and Ponds. These waters are jurisdictional to the ordinary high water line (OHWL). \* \* \*."

We understand the final order's reference to OAR 141-085-0515(3) along with its description of the waterway as a channel and explicitly rejecting it as a ditch to be a conclusion that the drainage channel is a water of the state.

Those conclusions are supported by substantial evidence in the record. The relevant findings in the final order include the following. TSI determined that there was a 0.36 acre drainage channel within the study area. The drainage channel "extended the length of the study area at the southern end and was currently managed by the Gaines Water Improvement District to convey irrigation water to district members via Crabtree Creek." Unitis suspected that the drainage channel was actually a pre-existing natural drainage that had been artificially straightened, which was historically common on agricultural land in the area.

---

[8] Although the final order also includes a definition of "intermittent stream," which is "any stream which flows during a portion of every year and which provides spawning, rearing or food-producing areas for food and game fish," OAR 141-085-0510(49), the order contains no findings regarding fish in the drainage channel, and thus, we do not understand the order to have concluded that the drainage channel was an intermittent stream.

In Unitis's email exchange with Monnin from TSI, Unitis asked whether there was any evidence suggesting that the irrigation channel was not created from a pre-existing natural drainage feature. DSL ultimately accepted TSI's wetland delineation and issued a jurisdictional determination that included a finding that the wetlands fell within DSL jurisdiction. When Ryan was reviewing the file as part of the reconsideration process, he "consulted DSL's Hydric Soils Map and determined both the excavated pond and the alleged ditch contained hydric, or wetland, soil." Ryan also contacted the president of the Gaines Water Improvement District "who informed him that the water conveyance system that included the alleged ditch was a combination of natural waterways and man-made connections" and that "the channel within the study area cannot be dewatered because multiple sources contribute water to the system and thus the channel."[9] Ryan also reviewed topographic maps and "determined that the channel in issue is a naturally occurring tributary to Crabtree Creek that was later channelized." And as quoted above, the final order articulates a rational connection between those facts and the legal conclusions it drew from them.

Having concluded that the final order is supported by substantial evidence and substantial reason regarding its determination that the drainage channel is a jurisdictional wetland subject to Oregon's Removal-Fill Law and that the channel is not a ditch, we need not address petitioner's contention that the drainage channel qualifies as a non-jurisdictional ditch—which would mean that it is exempt from the Removal-Fill Law—and that DSL erred in concluding otherwise.[10]

---

[9] Petitioner asserts that DSL erred in relying on hearsay. However, petitioner did not object to that testimony at the hearing and that argument before us is not well-taken.

[10] As explained above, the final order concludes that the drainage channel does not qualify as a ditch, but that even if it did, petitioner "failed to show that conveyance qualifies as a non-jurisdictional ditch pursuant to OAR 141-085-0515(9)." OAR 141-085-0515(9) states:

"Non-Jurisdictional Irrigation Ditches. Existing irrigation ditches that meet the following tests are not jurisdictional:

"(a) Are operated and maintained for the primary purpose of conveying water for irrigation; and

In sum, we conclude that the final order is supported by substantial evidence and substantial reason, and we reject all of petitioner's assignments of error.

Affirmed.

---

"(b)  Are dewatered for the non-irrigation season except for water incidentally retained in isolated low areas of the ditch or are used for stock water runs, provision of water for fire suppression, or to collect storm water runoff."

Because the irrigation channel is not a "ditch," this exception would not apply.